IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HOWARD BANK, as successor to
FRIST MARINER BANK,

    *Plaintiff*,

v.

COMPU-LINK CORPORATION,
d/b/a CELINK,

    *Defendant*.

Civil Action No. ELH-20-314

**MEMORANDUM OPINION**

This case concerns the timeliness of removal.  But it is not a mundane dispute.  Rather, it presents the novel issue of whether a contract's notice provision delineates the exclusive methods for effecting service of process, which in turn determines when the time period for removal begins to run.

Plaintiff Howard Bank, as successor to First Mariner Bank ("First Mariner"),[1] filed suit in the Circuit Court for Baltimore City against Compu-Link Corporation d/b/a Celink ("Celink"), alleging that Celink breached its contractual obligations to indemnify First Mariner for losses that First Mariner sustained defending a lawsuit that settled in 2017.  ECF 2 (the "Complaint").  The Complaint contains six counts under Maryland law: breach of contract (Count One); contractual indemnity (Count Two); common law indemnity (Count Three); contribution (Count Four); negligence (Count Five); and negligent misrepresentation (Count Six).  Defendant removed the action to federal court, asserting diversity of citizenship jurisdiction under 42 U.S.C. § 1332.  ECF 1 ("Notice of Removal"), ¶ 1.

---

[1] Although the underlying contract refers to the bank as "1st Mariner," the parties use "First Mariner."  To avoid confusion, I shall adopt their nomenclature.

Celink has moved to dismiss the Complaint, claiming lack of personal jurisdiction, pursuant to Fed. R. Civ. 12(b)(2), and failure to state a claim, under Fed. R. Civ. P. 12(b)(6). ECF 8.  The motion is supported by a memorandum of law (ECF 8-1) (collectively, the "Motion to Dismiss") and five exhibits.  ECF 8-2 to ECF 8-6.  Howard Bank opposes the Motion to Dismiss (ECF 18) and Celink has replied.  ECF 21.

In addition, Howard Bank has moved to remand the suit to State court, pursuant to 28 U.S.C. § 1447(c) and Local Rule 105 (ECF 16), accompanied by a memorandum.  ECF 16-1 (collectively, the "Motion to Remand").  Celink opposes the Motion to Remand (ECF 20) and Howard Bank has replied.  ECF 22.

The motions are fully briefed and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I will grant Howard Bank's Motion to Remand.  Therefore, I shall deny, without prejudice, Celink's Motion to Dismiss.

## I.      Factual Background[2]

Before merging with Howard Bank in 2018, First Mariner was a Maryland-chartered trust company based in Baltimore.  *See* ECF 2, ¶¶ 2, 7; First Mariner Bancorp. Annual Report (10-K Form) (Dec. 31, 2008) (hereafter "2008 10-K Form").  Among other business ventures, First Mariner originated reverse and conventional mortgage loans through commission-based loan officers.  *See* 2008 10-K Form; *see also* ECF 2, ¶ 8.  First Mariner sold some of these reverse

---

[2] Given the procedural posture of this case, I must assume the truth of all factual allegations in the Complaint.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  Further, the Court "may take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

mortgage loans to the Federal National Mortgage Association ("Fannie Mae").  ECF 2, ¶ 8.  Under this arrangement, the U.S. Department of Housing ("HUD") insured the loan, but First Mariner retained the right to service the loan on behalf of Fannie Mae.  *Id*. ¶¶ 8-10.

On May 22, 2006, First Mariner entered into a Reverse Mortgage Subservicing Agreement ("RMSA" or the "Agreement") with Celink, a Michigan corporation headquartered in Lansing, Michigan.  *See id.* ¶¶ 3, 12; ECF 8-2 (RMSA).  The Agreement includes a choice-of-law provision, which provides that its terms "shall be construed" in accordance with  Michigan law.  ECF 8-2 at 22.  Further, § 9.04 of the Agreement, titled "***Notices***," addresses communications between First Mariner and Celink.  *Id.* at 23.  It provides, *id.*:

> All demands, notices, certificates or other communications hereunder shall be in writing (unless otherwise specified) and shall be deemed given when personally delivered or four (4) Business Days after mailing by United States Postal Service Second Day Priority Mail, postage prepaid, return receipt requested, addressed to the appropriate Notice Address.

Section 1.01 of the Agreement specifies that Celink's "Notice Address" is its headquarters in Lansing, Michigan.  *Id.* at 8.

Pursuant to the RMSA, Celink agreed to service certain reverse mortgages for which First Mariner was the owner or servicer, including loans that First Mariner had sold to Fannie Mae and thus were insured by HUD.  ECF 2, ¶ 12.  Specifically, § 5.02 of the RMSA provides that, as to each loan, "until the earlier of the payment in full of such loan, the termination of this Agreement, or the sale and assignment, or other disposition of ownership," Celink would "subservice the Loan . . . as Subservicer on behalf of 1st Mariner and shall do all things necessary to perform such services pursuant to this Agreement . . . ."  ECF 8-2 at 14.  Among other subservicing obligations, Celink agreed to comply with all Fannie Mae and HUD requirements.  ECF 2, ¶ 15.  In exchange, First Mariner paid Celink a monthly fee for each loan that it serviced.  *See* ECF 8-2 at 16-17.

The Agreement contains an indemnification provision obligating Celink to reimburse First Mariner for certain losses.  Specifically, § 9.12(a) of the RMSA states, *id.* at 24:

> Celink agrees to, and does hereby indemnify and hold harmless 1st Mariner and its directors, officers, employees and agents, and their successors and assigns against, and shall reimburse 1st Mariner for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses, and disbursements of any kind or nature whatsoever including reasonable fees and expenses of counsel of litigation which may be imposed on, incurred by or asserted against 1st Mariner, in any way related to, or arising out of, this Agreement or any of the transactions contemplated herein, to the extent that any of the same results from or arises out of (i) any material breach of any representation or warranty made by Celink in this Agreement, [or] (ii) any material breach by Celink of any covenant or obligation of Celink under this Agreement or any schedule, written statement, document, or certificate furnished by Celink pursuant to this Agreement.

On March 31, 2011, First Mariner and Sun West Mortgage Company, Inc. ("Sun West"), executed two agreements, by which First Mariner assigned to Sun West its rights, title, and interest in approximately 2,200 reverse mortgage loans owned by Fannie Mae and serviced by First Mariner (the "Loans").  ECF 2, ¶ 18.  First, in a contract titled "Assignment of Servicing Rights Agreement," First Mariner assigned the mortgage servicing rights associated with the Loans to Sun West, and Sun West agreed to accept the assignment.  ECF 8-3 (Servicing Agreement).  Second, in a contract titled "Services and Indemnification Agreement," First Mariner and Sun West agreed to certain servicing standards.  ECF 8-4 (Services Agreement).  According to First Mariner, prior to the assignment, Celink serviced the Loans on behalf of First Mariner.  ECF 2, ¶ 18.

On or about August 5, 2015, Sun West filed breach of contract claims against First Mariner and several other defendants in the United States District Court for the Central District of California, alleging that the Loans had been improperly or inadequately serviced before the assignment, including by failing to meet various HUD requirements.  *Id.* ¶¶ 19-20; *see Sun West*

*v. First Mariner*, No. 2:14-cv-04903-PSG-AS, ECF 1 (C.D. Cal.). In total, Sun West allegedly sought to recover more than $7 million in damages from First Mariner. ECF 2, ¶ 21.

According to Howard Bank, because Celink serviced the Loans that First Mariner assigned to Sun West, any damages that Sun West sought against First Mariner "were the direct result of Celink's failure to fulfill its contract obligations" under the RMSA. *Id.* ¶ 22. Howard Bank claims that First Mariner "did not discover, and could not have discovered," Celink's alleged breach of the RMSA until the Sun West litigation. *Id.* ¶ 23.

Invoking the indemnification clause in the RMSA, First Mariner allegedly invited Celink to participate in the settlement negotiations between First Mariner and Sun West on April 30, 2017. *Id.* ¶ 25. However, Celink declined First Mariner's invitation. *Id.* Ultimately, in May 2017, First Mariner and Sun West settled the lawsuit for an undisclosed amount. *Id.* ¶ 26; *see Sun West v. First Mariner*, No. 2:14-cv-04903-PSG-AS, ECF 203 (C.D. Cal.).

First Mariner allegedly "incurred substantial legal fees" in connection with defending the Sun West litigation. ECF 2, ¶ 27. Following the settlement of the Sun West litigation, First Mariner made "multiple requests" to Celink to cover these losses, pursuant to § 9.12 of the RMSA, but Celink allegedly refused to compensate First Mariner. *Id.* ¶ 28.

Howard Bank acquired First Mariner on March 1, 2018. *Id.* at ¶ 2. On September 25, 2019, Howard Bank, as successor in interest to First Mariner, filed this suit in the Circuit Court for Baltimore City. ECF 2. Howard Bank alleges that Celink breached the RMSA, *inter alia*, by failing to properly and adequately service the Loans on behalf of First Mariner between May 22, 2006 and March 31, 2011, and by refusing to indemnify First Mariner in connection with the Sun West litigation. *See id.* at ¶¶ 32-35. As noted, the Complaint contains six counts, all arising under

5

State law.  *Id.* ¶¶ 29-70.  Howard Bank seeks "compensatory damages in an amount in excess of $75,000 to be proved at trial."  *Id.* at 12.

On October 14, 2019, Howard Bank served a copy of the summons and Complaint by certified mail on Celink's registered agent in Maryland, "CSC-Lawyers Incorporating Service Company" ("CSC").  ECF 5-1 (11/15/2019 Affidavit of Service); *see also* ECF 1, ¶ 2.  Celink's registered agent in Maryland subsequently forwarded the summons and Complaint by email to Celink's headquarters in Michigan.  ECF 13-1 (Declaration of Rebecca Marks ), ¶ 5.  However, according to Rebecca Marks, the Vice-President and Supervisory Paralegal in Celink's Legal Department, "the Celink employees responsible for checking that email in-box inadvertently failed to open that email in the normal course of business."  *Id.*  As a result, Celink did not respond to Howard Bank's Complaint in the circuit court.

On January 21, 2020, Howard Bank moved for entry of default against Celink in State court.  ECF 5 (Request for Entry of Default).  Celink received a copy of the filing via email from CSC on January 24, 2020.  *See* ECF 13-1, ¶ 4.  Thereafter, on February 6, 2020, Celink filed a Notice of Removal in the circuit court and in the District of Maryland.  ECF 1; ECF 1-5.

On February 13, 2020, Celink filed its Motion to Dismiss, asserting that the Court lacks personal jurisdiction and that Howard Bank's Complaint fails to state plausible claims.  ECF 8.  Then, on February 27, 2020, Howard Bank filed its Motion to Remand, arguing that Celink's removal was untimely.  ECF 16.

## II.    Choice of Law

Jurisdiction is based on diversity of citizenship.  ECF 1, ¶ 1; *see* 28 U.S.C. § 1332.  Under the *Erie* doctrine, it is "a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law.'"  *Shady Grove Orthopedic Assocs., P.A. v.*

*Allstate Ins. Co*., 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965));
*see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Anand v. Ocwen Loan Serv., LLC*, 754
F.3d 195, 198 (4th Cir. 2014).   Consequently, the interpretation of a contract like the RMSA is a
matter of state law.   *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ*., 489 U.S.
468, 474 (1989); *James v. Circuit City Stores, Inc*., 370 F.3d 417, 421-22 (4th Cir. 2004).   On the
other hand, federal law governs service of process.   *See, e.g*., *Hanna*, 380 U.S. at 463-64
(concluding that Fed. R. Civ. P. 4 was "designed to control service of process in diversity actions"
and ruling that Rule 4, not Massachusetts law, controls methods of service).

Because Maryland is, of course, the forum state, I must apply Maryland substantive law,
including its choice of law rules, to determine which state's substantive law applies to the
Agreement.   *Small v. WellDyne, Inc*., 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Francis v. Allstate
Ins. Co*., 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co*.,
566 F.3d 150, 154 (4th Cir. 2009).   When a contract contains a choice of law provision, Maryland
courts apply § 187(2) of the *Restatement (Second) of Conflict of Laws* (1971) ("*Restatement*"),
which states: "The law of the state chosen by the parties to govern their contractual rights will be
applied."   *See Ace Am. Ins. Co. v. Grand Banks Yachts, Ltd*., 587 F. Supp. 2d 697, 704 (D. Md.
2008) (applying *Restatement* § 187(2)).   Notwithstanding this general rule, a contract's choice of
law provision is unenforceable under Maryland if the "choice of law jurisdiction has no substantial
relationship to the transaction, or there is a fundamental policy difference in the laws of another
jurisdiction with a more substantial interest in the parties or the transaction."   *United States ex rel.
Tusco, Inc. v. Clark Constr. Grp*., 235 F. Supp. 3d 745, 752 n.9 (D. Md. 2016) (citing *Jackson v.
Pasadena Receivables, Inc*., 398 Md. 611, 921 A.2d 799, 803-05 (2011)); *see Restatement*
§ 187(2).

The Agreement expressly provides that its terms "shall be construed" in accordance with Michigan law.  ECF 8-2 at 22.  Neither party contests the validity of the Agreement's choice-of-law provision.  Therefore, I shall apply Michigan law in interpreting the RMSA.

### III.    Discussion

Howard Bank argues that Celink's removal was improper and therefore this Court must remand the action to State court.  ECF 16-1 at 3-4.  Celink counters that there is no defect with its removal and instead contends that the Court should dismiss the case for lack of personal jurisdiction or failure to state a claim.  ECF 8-1 at 9-23.  I begin with Howard Bank's removal argument, as it strikes at the heart of the Court's authority even to consider Celink's contentions.

District courts of the United States are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A., Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed."  *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted).

A federal court must presume that a case lies outside its jurisdiction unless and until jurisdiction has been shown to be proper.  *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008); *see Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 (1799) ("[T]he fair presumption is . . . that a cause is without [an inferior federal court's] jurisdiction, until the contrary appears.").  That

task falls on the party invoking the court's jurisdiction.  *See Strawn v. AT&T Mobility Corp.*, 530 F.3d 293, 296 (2008) ("[A] party seeking to adjudicate a matter in federal court must allege and, when challenged, must demonstrate the federal court's jurisdiction over the matter."); *see also Home Buyers Warranty Corp.*, 750 F.3d at 432.  Where the case has been removed from state court, the "party seeking removal bears the burden of demonstrating that removal jurisdiction is proper."  *In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 583 (4th Cir. 2006); *see Strawn*, 530 F.3d at 296; *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005).

The removal of civil cases intrudes on state sovereignty and threatens to undermine the vital role that state courts play in our federalist system.  *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941); *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994).  Consequently, "removal statutes must be strictly construed" and, when in doubt, a federal court should remand the case to state court.  *Elliot v. Am. States Ins. Co.*, 883 F.3d 384, 390 (4th Cir. 2018); *see Shamrock Oil & Gas Corp.*, 313 U.S. at 109 (admonishing that federal courts must "'scrupulously confine'" their removal jurisdiction) (citation omitted).

Among the narrow band of disputes over which a federal court may exercise jurisdiction are those civil actions where the parties are citizens of different states and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).  Where a case meets these requirements, but was nevertheless initiated in state court, the defendant may remove the suit to the appropriate federal court, if Congress has not provided otherwise and so long as the defendant in the diversity action is not a citizen of the state where the action was brought.  28 U.S.C. § 1441(a), (b)(2).

Here, the parties do not dispute that Howard Bank's suit satisfies the requirements of 28 U.S.C. § 1332, and therefore that it could have been filed in federal court in the first instance.

Instead, they disagree as to whether Celink followed the proper procedure for removing a suit.

Those procedures are set forth in 28 U.S.C. § 1446.  Relevant here, § 1446(b)(1) provides:

> The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

In *Murphy Brothers v. Michetti Pipe Stringing, Inc*., 526 U.S. 344 (1999), the Supreme Court distinguished between actual notice and formal service of process for the purposes of § 1446(b).  It is a "bedrock principle," the Court observed, that an "individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process."  *Id.* at 347.  Consistent with this principle, the Court found that § 1446(b)'s thirty-day limit on removal begins to run "only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend."  *Id.* at 350.  In other words, the "time for counting the days for filing notice of removal under § 1446(b) starts when the defendant is formally served with the summons and complaint making the defendant an official party to the action and requiring the defendant to appear."  *Elliott*, 883 F.3d at 391.

This straightforward rule tracks common sense.  For example, in *Murphy Brothers*, 526 U.S. at 347-50, the Supreme Court concluded that the thirty-day removal countdown did not begin when the plaintiff transmitted a facsimile copy of the complaint to the defendant.  Rather, it began when the defendant received official service of the summons and complaint two weeks later.  In so ruling, the Court noted that embracing a "receipt rule" could "operate with notable unfairness" to defendants by enabling plaintiffs to trigger § 1446(b) through informal service but then delay formal service in order to run out the removal clock.  *Id.* at 356.

Similarly, in *Elliot*, 883 F.3d 384, the Fourth Circuit determined that where a plaintiff chooses to serve the defendant's statutory agent, § 1446(b)'s clock does not commence until the defendant actually receives the summons and complaint from the agent, reasoning that serving the statutory agent "does not guarantee that the defendant is provided with actual notice of the complaint or adequate time to decide whether to remove the case." *Id.* at 393. Such a rule, the Court explained, comports with the purposes animating § 1446(b): "to provide the defendant with adequate time to consider filing for removal, and to create uniform time limits for responding to a complaint." *Id.*

Howard Bank asserts that Celink's removal was untimely. According to Howard Bank, it served Celink on October 14, 2019, when CSC, Celink's resident agent in Maryland, received the summons and Complaint that Howard Bank had sent via certified mail. ECF 16-1 at 2. Because that is a permissible method of service under Maryland law, Howard Bank maintains that Celink had to remove the action by November 13, 2019. *Id.* at 3. Because Celink did not file its Notice of Removal until February 6, 2020—more than three months later—Howard Bank posits that Celink's removal is foreclosed by § 1446(b). *Id.* at 4.

In contrast, Celink avers that, to date, the removal clock has not started to run and thus its removal is timely. ECF 20 at 8. Maryland's rules regarding service are "irrelevant," Celink argues, *id.* at 8, because § 9.04 of the RMSA "mandates a specific method and place of service"—service on Celink's Michigan headquarters through either personal delivery or mail. ECF 13 at 10. Because Howard Bank failed to utilize the methods outlined in § 9.04, Celink contends that it has never been formally served, as is necessary to trigger § 1446(b)'s thirty-day clock. ECF 20 at 9-10. And, if the clock never started, Celink reasons that its removal cannot be time-barred.

Celink is correct that parties can agree by contract to a particular method of service not specified by the Federal Rules of Civil Procedure. *See Nat'l Equipment Rental Ltd., v. Szukhent*, 375 U.S. 315-16 (1994) (finding it "settled" law that "parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether"); 4 C. WRIGHT, A. MILLER, & A. STEINMAN, FEDERAL PRACTICE AND PROCEDURE § 1062 (4th ed. 2020) (collecting cases for the proposition that "a person or an entity can consent to receive service of process in a manner that deviates from Rule 4 or can waive notice and service altogether"). And, it is conceivable that in such a case, the parties' agreed-upon method of service, not the federal rules, would control. *See Greystone CDE, LLC v. Sante Fe Pointe, L.P.*, No. 07 CV. 8377(RPP), 2007 WL 4230770, at *3 (S.D.N.Y. No. 30, 2007) (opining that the "parties' contractual language, and not the Federal Rules of Civil Procedure, governs what constitutes proper service in this case" but not deciding the issue because the parties agreed on this point). Moreover, Celink is right that Maryland law is of no help in determining whether the Agreement provides for a specific method of service because Michigan law applies. *See* ECF 8-2 at 22. All that said, applying Michigan principles of contract interpretation to the RMSA, it is clear that § 9.04 does not dictate the rules of service.

When interpreting a contract, Michigan courts "'give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself.'" *Kendzierski v. Macomb County*, 503 Mich. 296, 311, 931 N.W.2d 604, 612 (2019) (quoting *Wyandotte Elec. Supply Co. v. Elec. Tech. Sys., Inc*., 499 Mich. 127, 144, 881 N.W.2d 95, 103 (2016)); *see Jay Chevrolet, Inc. v. Dedvukaj*, 310 Mich. App. 733, 735, 874 N.W.2d 146, 148 (2015) ("The goal of contract interpretation is to give effect to the intent of the parties."). This lodestar principle requires courts to "give the words used in the contract their plain and ordinary

meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 465, 703 N.W.2d 23, 28 (2005); *see DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 366, 817 N.W.2d 504, 509 (2012); *Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc.*, 477 Mich. 75, 84, 730 N.W.2d 682, 687 (2007); *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776, 780 (2003).

Where the contract's terms are unambiguous, the contract is "not open to judicial construction and must be *enforced as written*." *Rory*, 473 Mich. at 461, 703 N.W.2d at 26 (emphasis in original); *see Kendzierski*, 503 Mich. at 311, 931 N.W.2d at 612; *accord Stryker v. Nat'l Union Fire Ins. Co.*, 842 F.3d 422, 426 (6th Cir. 2016) (applying Michigan law; "When a written instrument is patently unambiguous, courts must give effect to that objective expression of contractual intent."). A contract is ambiguous "'if it is equally susceptible to more than a single meaning'" or "'if two provisions of the same contract irreconcilably conflict with each other[.]'" *Kendzierski*, 503 Mich. at 311, 931 N.W.2d at 612 (citations omitted); *see also 51382 Gratiot Ave. Holdings, LLC v. Chesterfield Dev. Co., LLC*, 835 F. Supp. 2d 384, 391 (E.D. Mich. 2011).

Applying this interpretive framework to § 9.04 of the RMSA, the language cannot be read as a limitation on the acceptable methods of service. As indicated, § 9.04 provides, ECF 8-2 at 23: "All demands, notices, certificates or other communications hereunder shall be in writing . . . and shall be deemed given when personally delivered or four (4) Business Days after mailing by United States Postal Service . . . addressed to the appropriate Notice Address." This language imposes two requirements. First, it requires that all notices be reduced to writing. *See People v. Kern*, 288 Mich. App. 513, 519, 794 N.W.2d 362, 367 (2010) (holding that the use of the term "shall" in a contract "generally indicates a mandatory, rather than permissive, duty"); *see also Me. Cmty. Health Options v. United States*, ___ U.S. ___, 140 S. Ct. 1308, 1321 (2020) (observing that

"shall" carries a mandatory connotation).  Second, the language of § 9.04 specifies that a notice "shall be deemed given"—that is, the sender will be treated as having sent a notice and the recipient will be treated as having received it—if the notice is either personally delivered to the Notice Address or four business days after it is mailed to the Notice Address.

Nowhere in § 9.04 is there language that purports to prohibit methods of communication other than the two that are listed.  *Cf. BAE Sys. Tech. Sols. & Servs., Inc. v. Rep. of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463 (4th Cir. 2018) (discussing mandatory and permissive forum selection clauses).  Indeed, the "shall be deemed given" language is language of inclusion, not exclusion.  That is, § 9.04 merely obligates the parties to *accept* communications sent by personal delivery or mail to the Notice Address.  It does not, however, forbid the parties from utilizing other methods to send a notice.  For instance, § 9.04 in no way bars Howard Bank from sending a letter to Celink via carrier pigeon.  Nor does § 9.04 endorse willful ignorance of a notice that is actually received.  Thus, if Howard Bank's carrier pigeon is true to its mark and delivers its cargo, Celink cannot point to language in § 9.04 that would allow it to disregard the message.

Notably, the Agreement easily could have been written to limit the parties' methods of communication.  For example, the RMSA could have specified that "all notices shall be deemed given *only if* made through personal service or mail."  But, that language did not make its way into the contract and the Court cannot insert it now.  *See Dawson v. Farm Bureau Mut. Ins. Co. of Mich.*, 293 Mich. App. 563, 568, 810 N.W.2d 106, 109 (2011) ("It is not the province of the judiciary to rewrite contracts . . . but instead to enforce contracts as written and agreed to by the parties.").  Thus, because § 9.04 does not require that communications be made in any particular manner, Howard Bank was free to utilize any means permitted by federal law to effect service of process on Celink.

Undeterred by the plain language of § 9.04, Celink points to various cases to argue that courts have construed "nearly identical contract language" to govern service of process. ECF 20 at 8-9. But, the cases on which Celink relies do not support its argument.

Celink cites a trio of out-of-circuit cases that concern whether the plaintiff served an instrumentality of a foreign state, such as an embassy, state-owned business entity, or foreign military, in compliance with the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(b)(1), which provides that service "shall be made . . . in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality" if such an arrangement exists. *See Arbitration Between Space Sys./Loral, Inc. v. Yuzhnoye Design Office*, 164 F. Supp. 2d 397 (S.D.N.Y. 2001); *Saunders Real Estate Corp. v. Consulate Gen. of Greece*, No. 94-11951, 1995 WL 598964 (D. Mass. Aug. 11, 1995); *Marlowe v. Argentine Naval Comm'n*, 604. F. Supp. 703 (D.D.C. 1985). In each case, the court determined that contract language analogous to § 9.04 qualified as a "special arrangement" for the service of process under the FSIA, and therefore the plaintiff's service was valid. *See Space Sys./Loral, Inc.*, 164 F. Supp. 2d at 402; *Saunders Real Estate Corp.*, 1995 WL 598964, at *2; *Marlowe*, 604. F. Supp. at 708. None, however, address the import of a contract's notice provision vis-à-vis the Federal Rules of Civil Procedure, no less whether the provision excludes other methods of service.

Celink's other case, *Choice Hotels International v. SM Property Management, LLC*, 519 F.3d 200 (4th Cir. 2008), is also of no aid to Celink. In that case, a franchisor and franchisees entered into a franchise agreement that provided that "'[a]ll notices required or permitted under this Agreement must be in writing, must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized courier service . . . to you at the Designated Representative's address.'" *Id.* at 208 (alterations in original; emphasis omitted). The

relationship ultimately soured, and the franchisor sought to initiate arbitration proceedings against the franchisees. However, despite the franchise agreement's notice provision, the franchisor mailed the "Demand For Arbitration" form to the franchisees' personal addresses, not the address of the designated representative as specified in the franchise agreement. *Id.* at 205. As a result, the franchisees did not appear for the arbitration and the arbitrator entered an award in favor of the franchisor. The franchisees then went to federal court to vacate the award, claiming that they were not properly notified of the arbitration proceedings. *Id.* at 206.

The Fourth Circuit affirmed the vacatur. *Id.* at 210. The Court observed that the rules of the American Arbitration Association ("AAA") permit a notice of arbitration proceedings to be sent either by personal service or by mail to the party or the party's representative. *Id.* at 207. And, it acknowledged that the franchise agreement's arbitration clause specified that any arbitration would be governed by the AAA's rules. *Id.* at 204, 210. But, the AAA expressly permits modification of its rules through contract. *Id.* at 210. And, nothing in the arbitration clause "trump[ed] the all encompassing notice-to-the-properly-designated-representative language" in the franchise agreement. *Id.* That language's requirement that "all" notices "be personally delivered or mailed . . . to the [Franchisees] at the Designated Representative's address," the Court opined, "means **all**." *Id.* (alterations and emphasis in original). Accordingly, the Court explained that in order to give the franchisees proper notice of the arbitration, the franchisor had to mail the Demand for Arbitration to the franchisees' designated representative. *Id.*

If anything, *Choice Hotels* cuts against Celink. First, the notice provision at issue in *Choice Hotels* expressly addressed the *transmission* of communications. *Id.* at 202 (franchise agreement: "notices . . . must be personally delivered or mailed by registered or certified mail, return receipt requested, or by a nationally recognized courier service"). In contrast, the language in § 9.04 of

16

the RMSA concerns the *acceptance* of communications.  *See* ECF 8-2 at 22 (§ 9.04: "notices . . . shall be deemed given").  Second, the notice provision at issue in *Choice Hotels* clearly delineated the universe of permissible methods of communication: it stated that "all" notices "must be either personally delivered or mailed," without exception.  519 F.3d at 208 (emphasis omitted).  In contrast, § 9.04 of the Agreement does not limit communications to those sent by personal service or mail to the parties' Notice Address.  Thus, the language in *Choice Hotels* undermines, rather than advances, Celink's argument.

Because the Agreement does not restrict the methods by which Howard Bank could effect service of process on Celink, the question becomes whether Howard Bank complied with the Federal Rules of Civil Procedure.[3]  Pursuant to Rule 4(h), a domestic corporation such as Celink must be served either "in the manner prescribed by Rule 4(e)(1) for serving an individual" or "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process."  Fed. R. Civ. P. 4(h)(1)(A)-(B).  As relevant here, an individual located in the United States may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Fed. R. Civ. P. 4(e)(1).

Accordingly, Howard Bank's service on Celink is valid if it complied with the law of the state in which this Court sits (*i.e.*, Maryland), the law of the state where service was accomplished (*i.e.*, Michigan), or with Rule 4(h)(1)(B).  Howard Bank's method of service—sending the summons and Complaint to CSC, Celink's registered agent in Maryland, via certified mail— satisfies all three standards.  *See* Maryland Rule 2-124(d) ("Service is made upon a corporation,

---

[3] As noted, *supra*, although the interpretation of the RMSA is a matter of state law, federal law governs procedural matters.  *Anand*, 754 F.3d at 198.

17

incorporated association, or joint stock company by serving its resident agent . . . ."); M.C.R. 2.105(D)(1) (Michigan standard) ("Service of process on a domestic or foreign corporation may be made by . . . serving a summons and a copy of the complaint on an officer or the resident agent."). Therefore, Howard Bank properly served Celink on October 14, 2019, when CSC received the summons and Complaint via certified mail. ECF 5-1.

Nonetheless, the fact that Howard Bank served CSC on October 14, 2019, does not *ipso facto* mean that § 1446(b)'s thirty-day clock started on that date. Rather, as already discussed, when a plaintiff serves the defendant's statutory agent, "the time to remove the case runs from the defendant's actual receipt of the complaint." *Elliot*, 883 F.3d at 392. In this case, Celink concedes that CSC emailed the summons and Complaint to Celink on October 16, 2019. ECF 13-1, ¶ 5.

Given that Celink received actual notice of plaintiff's suit on October 16, 2019, its ability to remove the suit expired on November 15, 2019. It did not, however, file its Notice of Removal until February 6, 2020. It follows that Celink's removal was untimely, and so the case must be remanded. *See, e.g.*, *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 188-89 (4th Cir. 2017) (affirming remand order where removal was untimely); *Link Telecomms., Inc. v. Sapperstein*, 119 F. Supp. 2d 536, 542 (D. Md. 2000) (remanding case that was removed six months after service).

## IV.    Conclusion

For the aforementioned reasons, I shall grant the Motion to Remand (ECF 16). Accordingly, I shall deny the Motion to Dismiss (ECF 8), without prejudice.

An Order follows.

Date: July 16, 2020                                             _____/s/_____

Ellen L. Hollander
United States District Judge